## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Kristy Jean McGee, being first duly sworn, hereby declare and state as follows:

### I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent employed by the National Park Service (NPS), Investigative Services Branch (ISB). I have worked as a NPS Special Agent since 2004; my primary duty has always been to investigate violent crimes including sexual assaults. I have investigated more than 100 sexual assaults.

2. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents and United States Park Rangers of the National Park Service and other law enforcement agencies; and from my review of records and reports relating to the investigation. This Affidavit is intended to show that there is sufficient probable cause for the requested search warrant and it does not set forth each and every fact that I or others have learned during the course of this investigation.

3. This Affidavit is submitted in connection with an investigation into a sexual assault committed by Charles "Charlie" Barrett in Yosemite National Park in August 2016, and related witness tampering and obstruction. On August 4, 2022, a grand jury indicted Barrett on two counts of Aggravated Sexual Abuse in violation of 18 U.S.C. §§ 2241(a)(1) and one count of Abusive Sexual Contact in violation of 18 U.S.C. § 2244(b). That indictment, in matter 1:22-CR-00213-DAD, remains sealed at present (the "Pending Indictment"). The accompanying arrest warrant, issued on the same date by the Hon. Sheila K. Oberto, U.S. Magistrate Judge, is currently active and also remains under seal.

4. The investigation into Barrett's sexual assault on the victim is ongoing. Evidence indicates that around the date of the sexual assault, and for years afterward, Barrett used a cellular telephone bearing phone numbers                                and an **Apple MacBook Pro** laptop computer, to store evidence regarding the assault, communicate with the victim (and other earlier



GOVERNMENT'S EXHIBIT
1
1:22-CR-00213-ADA-BAM

BARRETT_00012124

victims of Barrett's sexual assaults), and engage in a campaign designed to intimidate witnesses from reporting Barrett's crimes.   The cellular telephone and computer are described in more detail in a set of Attachments A-1 and A-2, attached hereto and incorporated herein by reference.  As set forth herein, there is probable cause to believe Barrett has committed violations of 18 U.S.C. §§ 2241(a)(1), Aggravated Sexual Abuse; 18 U.S.C. § 2244(b), Abusive Sexual Contact; 18 U.S.C. § 2261A(2)(B), Stalking and Harassment; and 18 U.S.C. § 1513(e), Retaliating against a Victim and a Witness; and that evidence, contraband, fruits, and instrumentalities of these crimes as detailed in Attachment B, incorporated herein by this reference, will be found on the devices listed in Attachments A-1 and A-2 pertaining to Barrett's telephone and in a separate set of Attachments A-1 and A-2 that pertain to Barrett's computer.

5. As further described herein and in Attachments A-1 and A-2 for each device, this affidavit supports two related search warrants to seize and search:

a) A telephone bearing phone number                                located on the person of Charlie Barrett or within a 2008 Toyota Tacoma truck, California license plate            and

b) An **Apple MacBook Pro laptop** located on the person of Charlie Barrett or within a 2008 Toyota Tacoma truck, California license plate           .

## II.     APPLICABLE LAW

6. Title 18, United States Code, Section 2241(a)(1) (Aggravated Sexual Abuse) provides that whoever, in the special maritime and territorial jurisdiction of the United States knowingly causes another person to engage in a sexual act by using force against that other person, has violated 18 U.S.C. § 2241(a)(1).

7. Title 18, United States Code, Section 2244(b) (Abusive Sexual Contact) provides that whoever, in the special maritime and territorial jurisdiction of the United States, knowingly engages in

BARRETT_00012125

sexual contact with another person without that person's permission, has violated 18 U.S.C. § 2244(b).

8. Title 18, United States Code, Section 2261A(2)(b) provides that whoever, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person, violates 18 U.S.C. § 2261A(2)(b).

9. Title 18, United States Code, Section 1513(e), provides that whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, violates 18 U.S.C. § 1513(e).

### III. PROBABLE CAUSE

A. **Summary of Probable Cause**

10. Barrett sexually assaulted victim K.G. on or about August 13-16, 2016, in Yosemite National Park. On the evening of August 13, he strangled K.G. and then vaginally and anally penetrated her by force. On August 14, he digitally penetrated her vagina without consent. Later that same day, he again vaginally penetrated K.G. by force. Starting soon after the assault, Barrett began messaging K.G. about the offense. K.G. did not report the sexual assault to law enforcement until April 2020; within days of that report, she started receiving suspicious text messages and concerning phone calls which she believed they were from Barrett, and that he somehow knew of her report and was trying to intimidate her. Barrett also threatened her via social media and attempted to discredit, intimidate, and harass her. Barrett has taken similar action on the internet against other victims of his sexual misconduct.

3

11.     Barrett retained images of K.G., messages sent between them, and other evidence regarding the sexual assault on phones bearing numbers                                         as well as a **MacBook Pro computer**.

B. <u>Barrett's History of Violence and Witness Retaliation</u>

12.     Barrett has a history of retaliating against those who he believes have wronged him.  In September 2004, Yosemite rangers stopped Barrett for DUI.  Barrett threatened the rangers, telling them that he would hurt them and that they were not safe.  Five days after the stop, Barrett slashed one of the ranger's tires. Criminal Complaint, *U.S. v. Barrett*, 1:05-cr-22-AWI, at 1.  A grand jury indicted Barrett on several felony and misdemeanor charges.  Following a plea agreement, Barrett entered a plea to a misdemeanor vandalism charge and was ultimately sentenced to six months of imprisonment. *U.S. v. Barrett*, Judgment and Commitment, at 2.

13.     As further described below, in 2016 Barrett threatened the minor daughters of the ranger involved in the DUI stop.

14.     Barrett physically assaulted an ex-girlfriend in 2008 in Inyo County.  The two got into an argument and Barrett began repeatedly punching her in the head.  He was convicted of corporal injury to a spouse, in violation of California Penal Code Section 273.5, and sentenced to 180 days of jail.  Barrett served a term of probation afterward and was prohibited from contacting the ex-girlfriend.  However, Barrett called her house several times in violation of the restraining orders days before his probation was set to finish in 2014.

15.     I spoke to L.K., a rock climber who knows Barrett, in March 2022.  He described being threatened, stalked, and harassed by Barrett for more than ten years because he would not lie in court to misrepresent the 2008 incident when Barrett assaulted his ex-girlfriend.  L.K. said the beating involved Barrett repeatedly punching the victim in the face and side of the head, until she fell to the ground and was bleeding from her mouth, ear, and nose.

BARRETT_00012127

16. L.K. said Barrett uses phone calls, text messages, and social media accounts to harass him. He said Barrett makes "fake" Instagram accounts to post negative things about L.K. on various websites and forums.

17. In March 2022, L.K. received a series of calls from                    When L.K. answered the phone, the called would hang up. Barrett text-messaged a journalist in June 2022 from the same phone number and identified himself to the journalist as the user of the phone number.

18. Despite these incidents, Barrett is a world-renowned professional rock-climber, who has lived in Yosemite National Park for extended periods of time since 2002. He has written multiple guidebooks that describe climbing routes. Barrett has been featured in numerous climbing publications.

**C. Barrett's Sexual Assault of K.G.**

19. K.G. met Barrett in the summer of 2016 and he invited her to visit him in Yosemite National Park. K.G. traveled to the park on or about August 13, 2016, and met Barrett there. They went to a local swimming hole where other climbers and friends of Barrett's were swimming. Barrett invited K.G. to join him that night to watch a meteor shower.

20. That night, Barrett led K.G. to an isolated location. Barrett began aggressively kissing her and she tried to pull away from him, but Barrett overpowered her. Barrett forcefully pushed her to the ground and while she was on her back, he used one hand to strangle her to the point that she could not breathe. K.G. believed that Barrett might kill her. Barrett removed K.G.'s clothes and "violently raped" her anally and vaginally. During the assault Barrett said to K.G., "I can tell you like it rough."

21. Barrett's sexual assault of K.G. in the isolated location is the subject of Count One of the Pending Indictment.

22. K.G. remained with Barrett out of fear. The next day, though the two were physically separated for hours while Barrett was at work and K.G. was hiking, K.G. remained in fear of Barrett, and believed that if she left he might enact further violence on her. Later that same day (August 14,

BARRETT_00012128

2016), Barrett led her on a hike to the Tuolumne River, where they swam together.  While in or near the river, Barrett forcefully penetrated her vagina with his fingers without K.G.'s consent.  Barrett's digital penetration of K.G. is the subject of Count Two of Pending Indictment.

23.     That evening Barrett suggested that K.G. shower with him in a communal shower building. While in the shower he forcefully pushed her body up against the wall of the shower and sexually assaulted her again by vaginally penetrating her.  K.G. indicated that Barrett's assault hurt so badly that she was "wailing" from the pain.  Barrett's sexual assault on the night of August 14 in the shower building is the subject of Count Three of the Pending Indictment.

24.     K.G. remained in fear of Barrett, but felt she could not leave (before the time she had previously indicated her visit would last) for fear of additional violence or sexual assault.  On August 15, the two traveled outside of Yosemite to eat and stopped for a brief hike.  K.G. then departed the park.

25.     Barrett communicated with K.G. by phone regarding the assaults.  The day after K.G. left Yosemite, Barrett sent her a text message telling her he would be visiting the Bay Area and would like to see her.  K.G. replied to Barrett via text message that he had raped her and that she did not want to see him again.  Barrett responded that he had not raped her and that she had liked what he did.

26.     On September 13, 2016, K.G. received a text from Barrett at 11:43pm, that read: "Can we be friends? I miss you."  K.G. replied on September 14, 2016, at 8:24am, *"I find it hard to be friends with guys who rape me."*

D.  **Barrett Threatens Violence to Himself or Others Based on K.G.'s Accusing Him of Assault**

27.     Around the time K.G. told Barrett via the above texts that he sexually assaulted her, Barrett told several friends in person and via text over the course of a couple weeks that he was going to murder the 9-year-old twin daughters of the ranger who had previously stopped him for DUI "because [the ranger] ruined [his] life."

6

28. Barrett also told them he had a .44 magnum and a .45-caliber firearm, and he sent text messages to friends that he was going to "die with her," but it was unclear to whom Barrett was referring. Barrett told several of these friends he was going to go back to prison for the rest of his life and he had nothing to live for.

29. In a July 2021 interview with law enforcement, Barrett indicated that these comments stemmed from K.G. having told him that he raped her. He believed if she contacted law enforcement he would be sent to prison for the rest of his life.

30. The incident culminated with Barrett being taken into custody in the early morning hours of September 23, 2016. Barrett hid in the woods within the Tuolumne Meadows portion of Yosemite National Park, after indicating that he had loaded firearms and refused to come out. The Yosemite Special Response Team and crisis negotiators responded. Barrett eventually came out and was taken to the Community Regional Medical Center in Fresno and placed on a psychiatric hold for evaluation. No weapons were found near or with Barrett at the time he was taking into custody.

E. **Barrett's Efforts to Harass and Intimidate K.G.**

31. Despite K.G. having text-messaged Barrett that he had sexually assaulted her, Barrett continued to communicate with her. On October 26, 2019, Barrett sent K.G. a text while she was living in the Red River Gorge, Kentucky. She feared he was stalking her and was in the Red River Gorge because the message read, "Hey. Know we had a weird time and don't want any awkwardness but is that you? Hope you're crushing. Is this you?" The message had a loading wheel below the text as if something was trying to load; she suspected it was a photo of her.

32. Other witnesses confirmed that Barrett was, in fact, in the Red River Gorge and that he had arrived there just days after K.G. moved there in October 2019. Witnesses indicated that Barrett interfered with K.G.'s attempts to find employment by convincing the owner of a restaurant she was applying at that she was "insane," and she would cause problems for his business. The owner expressed

BARRETT_00012130

concern to law enforcement in a later interview that Barrett was stalking K.G. and may have followed her to the Red River Gorge.  The owner suggested that law enforcement investigate the potential stalking.

33.	K.G. provided law enforcement with screen shots and links to online rock climbing forums and social media posts from February 2020, when Barrett made posts alleging that an ex-boyfriend of K.G. had slashed Barrett's tires;[1] Barrett also mentioned another victim of his sexual assaults (VICTIM-2, described in further detail below) as a possible suspect.   Barrett messaged the ex-boyfriend via a social media platform: "I know you dated [K.G.].  I'm sure she said things to you so you have motive."  Barrett also told the ex-boyfriend that he [Barrett] knew where the ex-boyfriend's siblings and parents lived, and that he was going to harm them.  The ex-boyfriend filed a police report.  Barrett also sued the ex-boyfriend in small claims court but the suit was dismissed when Barrett failed to present any evidence.  Barrett used phone number (           ) to send the text messages threatening the ex-boyfriend's relatives.

34.	K.G. did not report Barrett's 2016 sexual assault until April 2020.  Within days of her reporting the offense, she received a text that read, "Hey [K.G.] Hope this is your number.  Anyway, I got your number from a friend and want to stay anonymous, but I have a few questions for you about a certain person."

35.	K.G. also indicated that she has received countless hang up phone calls from "burner numbers" since reporting the sexual assault; she believes they are from Barrett.

36.	Barrett continues to post on Instagram and send text messages to other people, including myself, stating he is in the process of suing K.G. and VICTIM-2 for defamation of character.  Barrett

---

[1] The ex-boyfriend denied slashing Barrett's tires, and given that Barrett actually had slashed a person's tires, it seems logical to conclude that he may have fabricated the story regarding the ex-boyfriend with a plausible accusation.  However, some of the harassing messages received by the ex-boyfriend during this time came from a phone number subscribed to Barrett's father.

8

has more recently been posting on Instagram, comparing himself to actor Johnny Depp, referencing a lawsuit against the reported victims, and referring to himself as "#mentoo." Victims and witnesses have contacted me when they saw these postings – concerned not only about the possibility of Barrett suing them, but also that he is doing this to prevent other victims from coming forward.

### F. Barrett's Sexual Assault of VICTIM-2

37.     VICTIM-2 reported to law enforcement that in 2010, Barrett sexually assaulted her at a residence in Inyo County, California. VICTIM-2 was introduced to Barrett just before she went to sleep. VICTIM-2 was sleeping in a den-type of room when she woke up and Barrett was squeezing her breasts with one hand underneath her tank top, while he was thrusting his erection between her legs. VICTIM-2 tried to pull away from Barrett. When she did this, he became even more aggressive and forceful and was trying to remove her shorts. Barrett continued to forcefully squeeze her breasts and vagina as she fought to get away from him. After what seemed like several minutes Barrett pushed her forward and got off her. Then he stated to her, "You are a fucking cunt," and walked out. She stayed up all night until Barrett left early in the morning.

### G. Barrett's Efforts to Harass and Intimidate VICTIM-2

38.     In 2017, a neighbor of VICTIM-2 told her Barrett sent the neighbor multiple text messages saying he was going to have people go to VICTIM-2's house to hurt her. VICTIM-2 was very concerned for her safety and left her home for several weeks.

39.     VICTIM-2 reported that Barrett posted pictures of her on his social media platforms; she did not know where he got the photos from, and she learned this through mutual friends she shared with Barrett. On September 6, 2018, at 11:26 PM Barrett changed his Facebook profile picture to a photo of VICTIM-2 and he changed it again hours later. She said he did this again the next day.

40.     In the Summer of 2019, Barrett placed a new climbing route within Yosemite National Park, at the Power Wall, in Tuolumne Meadows; he named it, "Fuck You (VICTIM-2's name) Fuck

9

You." Barret posted this online at http://www.8a.nu/, a website which posts ascents of accomplished climbers.

41. On October 25, 2019, another Instagram account owner reposted the climbing route on the Power Wall, "Fuck You (VICTIM-2's name) Fuck You," and Barrett commented on the post, "Oh the sweet Karma will get here."

42. I contacted VICTIM-2 at approximately 6pm on August 18, 2021, and I informed her that Barrett mentioned her on Instagram and was posting about her; she changed her account settings to private. Within minutes she notified me that she started getting friend requests from people she did not know. I asked her to forward the requests to me; she did, although she explained that she deleted the first few requests before contacting me. Over the next 12 hours VICTIM-2 received 24 requests from people she did not know; they were all connected to Barrett on social media. Barrett has over 4,000 "Followers" on Instagram.

43. On January 5, 2022, at 2:15 AM, Barrett walked into the Emergency Room at Mammoth Lakes Hospital and told the staff he was going to kill himself. He then proceeded to say if he was released, he would drive to Las Vegas and shoot VICTIM-2. He also said if he was not released, he had friends in Las Vegas who would kill her for him. Staff from the hospital called me and asked me for VICTIM-2's phone number so they could call her and warn her about Barrett's threats to kill her. Barrett had given them my phone number and told them I was investigating him for sexual assault and that VICTIM-2 was a witness in the case.

44. Individuals interviewed for this investigation at the request of Barrett have relayed that Barrett has for years posted, and continued to post, things about VICTIM-2, often naming her, on Instagram or Facebook, then he later removes the posts.

45. I interviewed a professional rock climber, E.P., in March 2021. He described Barrett's threatening and intimidating other people. Specifically, he described Barrett calling him in the middle

10

of the night, in 2018, and telling him he wanted to kill a Judge who presided over a case involving Barrett and how Barrett wanted to kill VICTIM-2. E.P. did not know VICTIM-2 also reported being sexually assaulted by Barrett. E.P. thought Barrett had a "crush" on VICTIM-2, "a long time ago, like ten years or something" because she used to be a "famous rock climber." E.P. indicated VICTIM-2 wasn't interested in Barret, and Barrett has "hated her ever since."

### H. Barrett's Sexual Assault of VICTIM-3

46. VICTIM-3 reported that after briefly dating Barrett in the fall of 2016, she became concerned regarding his increasingly volatile behavior, including his attempts to ascertain her movements and to prevent her from seeing friends. VICTIM-3 eventually broke up with Barrett in late 2016. Barrett continued to visit her residence. On some of these occasions, she allowed Barrett into her residence. One or more times in late 2016 or early 2017, Barrett physically held her down and raped her. She described him doing this on several occasions. She described him as being "unbelievably strong" and said he would sometimes take her phone away from her and lay on top of her so she could not move, to the point that she could not breathe. She stated, "He did that to show he had power over me."

### I. Barrett's Efforts to Harass and Intimidate VICTIM-3

47. VICTIM-3 filed for an Emergency Protection Order in January of 2017, indicating that Barrett threatened to kill her and was attempting to break into her house. She subsequently obtained a permanent restraining order.

48. In January 2017, a friend of Barrett's learned Barrett used his phone without his knowledge to threaten and intimidate VICTIM-3. The friend scolded Barrett and refused to allow him to use his phone. The friend said Barrett then called two other rock climbers and asked them to come to the friend's house. The friend did not know the names of the climbers, but he referred to them as "thugs." Barrett wanted to use their phones to further intimidate VICTIM-3. The friend said he kicked

BARRETT_00012134

them all out of his house.  The following day VICTIM-3 called the friend and told him Barrett had used his phone to call her and threaten her life.  The friend said VICTIM-3 was very worried for her safety.

49. VICTIM-3 reported to police that Barrett had continued to harass her following the granting of the restraining order, and law enforcement records confirm that Barrett was arrested in January 2017 for violating a protective order.  VICTIM-3 related that she agreed to allow Barrett to plea to lesser charges if he promised to leave her alone. She said he told her if she continued to pursue charges against him, he would "ruin her life." She described him coercing her by "blackmailing" her with photographs he found of her when she did a nude photo shoot as a young model.  He told her he would make sure her family and her employers saw them, that she would lose the support of her family, and that she would not be able to continue to work as a Yoga and Pilates instructor anymore.  She eventually allowed the restraining order to lapse.

**J. Additional Incidents of Harassment and Stalking By Barrett**

50. In February 2022, I spoke with a woman who dated Barrett between the summer of 2019 and January 2020.  Barrett told her that multiple women had accused him of sexual assault.  He asked the woman to harass the victims through social media and "burner phone numbers" to intimidate them; she said she would not, and this was why their relationship ended.

51. Notably, both K.G. and VICTIM-2 experienced harassment through social media accounts and untraceable numbers.

52. The woman also stated that Barrett would accuse her of cheating on him, when she was not.  He told her he had to prove her love for him by agreeing to "rough sex."

53. She stated, "He always had to be in control and dominate.  He liked tying me up and blindfolding me.  Choking me, sometimes really hard.  Anal, all the time.  And if I didn't want to, he would beg me and tell me I needed to prove I wasn't cheating on him.  When I said 'no' to anal, he would say, 'I was denying him love.'"

BARRETT_00012135

54. The woman described Barrett as being very afraid he was going to be sent back to prison. He told her he had to leave because he could not handle the pressure and he left abruptly in the Fall of 2019.

**K. July 2021 Law Enforcement Interview with Barrett**

55. I interviewed Barrett in July 2021. I told him what K.G. reported about the first violent assault. I told him that she was afraid to leave him at that time because she was afraid he would kill her. I relayed her report that Barrett aggressively kissed her, she did not reciprocate, she tried to create distance, while doing so her nose ring was ripped out, at that point he forcefully strangled her, and violently penetrated her both anally and vaginally. Rather than deny the allegations, Barrett said he wished he would have known that K.G. was afraid. As detailed above, he admitted that in September 2016 K.G. sent him a text message indicating that he had raped her and that he feared being sent to prison.

56. Barrett did not deny messaging people that he wanted to hurt VICTIM-2, or the social media intimidation of her. I relayed that a witness told me Barrett told the witness that Barrett wanted to "kill" VICTIM-2, and "go into court and kill the Judge, and everyone else in the room, and then take an arsenic pill." Barrett did not deny that he made these statements.

57. I also told him K.G. suspected he was calling her from fake numbers and sent her a text to inquire about the investigation, days after she reported, in April of 2020. Barrett also did not deny this and said he *"may have done this."*

58. At the end of the interview I told Barrett continuing to do these things would be considered witness intimidation. At the conclusion of the interview, I advised Barrett not to contact any of the victims or witnesses in this investigation to intimidate them or interfere with the investigation. I also asked Barrett not to post anything on social media about anyone involved, and not to use other people to influence or intimidate victims or witnesses on his behalf. I did this because it was clear

13

through the investigation and Barrett's own admissions, that he had been intimidating victims and witnesses through other people, via social media, and via use of the phone.

59. Immediately after the interview Barrett began contacting witnesses, asking them to testify to versions of events in Barrett's favor. Barrett traveled between the areas where victims lived in Boulder, Colorado, and Las Vegas, Nevada, and posted on social media that he was there. Barrett used social media to harass the victims and intimidate them by posting that he was being falsely accused of sexual assault, and indicating that he was going to sue the victims for defamation of character. K.G. indicated that she believes Barrett has been calling her from fake phone numbers, breathing into the phone, and then hanging up since days after she reported the rapes in April of 2020. I have often attempted to verify who is using numbers that have called K.G. in this manner. However, the numbers usually do not resolve (come back) to a genuine phone number. Based on my training and experience, I know that there are various methods by which individuals can mask their phone numbers or obtain phone numbers via the internet that will remain untraceable in this manner.

60. I have spoken with VICTIM-2 and learned that Barrett has a mandatory in-person court date in Mono County Superior Court, in Mammoth Lakes, California, on Monday, August 29, 2022, at 10:00 A.M. Should this application for a search warrant be granted, I propose to execute the existing arrest warrant for Barrett on or about that date and time, and to execute any search warrant(s) authorized by this Court by searching his person and his vehicle.

**LOCATION AND SEIZURE OF EVIDENCE IN SEXUAL ASSAULT AND HARASSMENT CASES**

61. During the interview I conducted with Barrett in July of 2021, he pulled out a laptop that appeared to be an Apple MacBook Pro, an external data storage drive, and his cell phone. Barrett told me that he saved all messages, photos, and screen shots of text messages with K.G. and other witnesses in this case. He told me he kept everything related to my investigation, to include screen shots from text

14

conversations with witnesses when he was inquiring what victims had told them. As Barrett actively looked for these things during our conversation, he relayed that he was using a new phone, and some of the information had not transferred. Barrett said he had more than one phone that would have information on it related to the investigation. Barrett did not want us to look at his phone or computer at that time, but he told me he would look for information and might share it later. Barrett also spoke of keeping screen shots of text messages sent to him from "burn numbers" from people calling him a "rapist."

62. Throughout this investigation witnesses provided information related to text messages they received from Barrett on two different phone numbers:                           Barrett has also sent messages to me from both of these phone numbers. More recently he has been using the                 umber. Some of the messages Barrett sent me included screen shots of communications he had related to other victims or witnesses. This information—combined with statements from witnesses that Barrett photographed and filmed them during sexual encounters without their knowledge (and their belief was he did so to blackmail them later)—lead me to believe evidence of the crimes of witness intimidation and harassment will be located on any phone, computer, or data storage device in Barrett's possession that is capable of retaining photographs and text communications. I further believe that information related to the weekend of the sexual assaults of K.G. and communications with her afterward will also be located on such of Barrett's electronic devices.

63. Information provided by witnesses and victims showing text messages and calls believed to be from "burner numbers" and "spoof applications" to conceal the caller's identity could be used by any cell phone or other electronic device with Wi-Fi capability. Even older devices that no longer have cellular or internet connectivity may still have these types of applications installed and relevant data retained therein.

64. From extensive information obtained during this investigation showing the steps Barrett

BARRETT_00012138

has used to conceal his identity, his long-term campaign of harassment though multiple platforms, and his very own admissions that he retains data related to this investigation, it is likely that Barrett has retained information regarding K.G., his other victims, and the various attempts to intimidate them on his electronic devices. Based on my training, experience, and knowledge gained during this investigation, therefore, it is likely that these storage devices and mediums retain evidence of Barrett's sexual assaults and efforts to intimidate witnesses.

65. Information provided by victims, witnesses, and from Barrett himself indicate he has retained information about each of the sexual assault victims in order to continue his harassment to prevent them from cooperating with criminal investigations and processes.

66. Because Barrett is transient, it is believed he will have most of these items on his person or on inside the truck he drives. He is currently driving a silver 2008 Toyota Tacoma, with a matching camper shell, bearing CA license plate            . Witnesses have stated Barrett keeps these items with him or inside his truck. Since this investigation started, Barrett has used several different iPhones of various generations; the last one I saw him with (in a selfie he posted on social media in April 2022) was a red iPhone 13.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

67. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

68. There is probable cause to believe that things that were once stored on the electronic devices I seek to seize and search may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

16