PHILLIP A. TALBERT
United States Attorney
ARIN C. HEINZ
MICHAEL G. TIERNEY
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>CHARLES BARRETT,<br><br>               Defendant. | CASE NO. 1:22-CR-00213-ADA-BAM<br><br>DECLARATION OF SPECIAL AGENT KRISTY MCGEE IN SUPPORT OF UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS<br><br>DATE: June 20, 2023<br>TIME: 10:00 a.m.<br>COURT: Hon. Ana de Alba |

I, Kristy McGee, declare under the penalty of perjury that:

1. On or about April 16, 2020, victim K.G. reported to Yosemite National Park Dispatch that Charles Barrett had sexually assaulted her in August 2016. I was assigned to the investigation in April 2020 and have played a lead role throughout the investigation.

2. I have over twenty years of law enforcement experience. I specialize in sexual assault and other cases involving violence toward victims. The investigation into Barrett has been the most complex and difficult sexual assault investigation I have ever participated in.

3. Prior to indictment, the investigation involved a variety of investigative methods, including interviews, collection of law enforcement records from other jurisdictions, issuing grand jury subpoenas, obtaining pen register/trap and trace data, and other methods.

4. Part of the reason this investigation was so complex and challenging is that many potential victims and witnesses expressed a fear of retaliation by Barrett. For example, K.G. mentioned several different types of threatening behavior she believed were linked to Barrett the first time I interviewed her, in late April 2020, and continued to express her fear throughout the investigation.

5. Throughout the investigation, I believed this to be a very credible fear. At the beginning of the investigation, I knew Barrett had slashed the tires of a United States Park Ranger who arrested him. I was also aware that in September 2016, Barrett had claimed to have a gun and to be ready to commit suicide. I have since talked to dozens of witnesses who have expressed fear regarding what Barrett might do to them or who have otherwise confirmed that he is an unstable and often-dangerous person. Other individuals refused to speak with investigators once they learned that Barrett was a subject of the investigation. Some of these individuals specifically commented that they did not wish to speak with us because they feared Barrett's retaliation against them.

6. Based on my training and experience, strangulation is indicative of a person's extremely high capacity for violence, including violence resulting in death. When combined with witness reports about Barrett's behavior and their fears, this made me and other investigators extremely cautious of Barrett retaliating against witnesses.

7. Barrett's actions during the investigation also supported the reasonableness of the fear of witness retaliation. In January 2022, as the investigation was ongoing, Barrett threatened to kill S.F., another person who had accused him of sexual violence. I am aware that Barrett pleaded guilty to a threat offense in Mono County Superior Court related to this threat.

8. Barrett was also a very prominent member of the rock-climbing community, having been professionally sponsored and having written multiple guidebooks. I know the rock-climbing community to be small. I knew that there was a high likelihood that potential witnesses might be hesitant to speak candidly about a prominent member of the community. Based on the size of the community, I knew that there was also a likelihood that Barrett would eventually learn many details of the investigation, such as who I interviewed.

9. I also know from my experience as an investigator specializing in assault and sexual assault cases that many victims are reluctant to discuss their experiences, even when the person who victimized them is not as prominent or dangerous as Barrett.

10. Barrett's reputation for instability and violence, when combined with the small size of the community, and the general reluctance of victims to speak out, posed constant difficulties for the investigation. Potential witnesses refused to speak to me and other investigators, or refused to discuss specifics of their interactions with Barrett.

11. Due to their reluctance, I and other investigators were forced to dig more deeply to find potential victims and to corroborate information we were able to gather.

12. The rock-climbing community is also very mobile. Individuals within the community move frequently and rarely have fixed addresses.

13. Barrett's threats and his prominence caused me and other investigators to develop a strategy for this investigation. At the beginning, we prioritized learning as much as possible from witnesses and victims who were further removed from Barrett, and we checked the details they provided. This took extensive time. Due in part to the COVID-19 pandemic restricting travel and the ability to contact witnesses, and in part to the difficulties I have already discussed, this initial phase took over a year to complete. At that point, we looked for an opportunity to interview Barrett. Following the interview with Barrett, we then planned to interview witnesses who were closer to him, since he would be fully aware of the investigation.

14. Because Barrett had no fixed address, our first opportunity to interview him came in July 2021. I and other investigators then spent several more months following up on the information Barrett provided. We also interviewed the witnesses closer to Barrett and corroborating information they provided, as well as the other investigative activities discussed in paragraph 3.

15. During the July 2021 interview, Barrett several times provided specific names witnesses who would support his version of events regarding K.G. Barrett did not claim that any of these individuals witnessed any sexual interactions between Barrett and K.G. I and other investigators interviewed several of these individuals. They generally did not provide the facts that Barrett claimed they would.

16. During the July 2021 interview Barrett at some points claimed to have messaged in detail with K.G. prior to the weekend of the assault in August 2016 regarding specific sexual acts. At other points, Barrett indicated that their conversations were verbal (and not messaging) and he also implied that there were no messages and Barrett simply drew conclusions about K.G. based on a photograph he had seen on social media.

17. Barrett was unable to provide any detail regarding the first of these varying alternatives (the explicit text messages). I invited Barrett to search his phone and computer for these messages. He did so during the interview but reported that he was unable to find them. He claimed that they might be located on a different device. I invited him to provide them to me at any time. He never did so. Investigators working as part of the team have reviewed multiple digital devices belonging to Barrett. To date, no evidence has corroborated Barrett's claim that such messages existed.

DATED: April 27, 2023

*Kristy J. McGee*
Kristy J. McGee
Special Agent, National Park Service