UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:22-cr-00213-ADA-BAM-1 |
| Plaintiff, | |
| v. | ORDER ON MOTIONS IN LIMINE |
| CHARLES BARRETT, | (ECF Nos. 50, 51, 53, 54, 67, 81) |
| Defendant. | |

**I.**

**Procedural Background**

On August 4, 2022, the Government filed an indictment against Defendant Charles Barrett alleging two counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(a)(1) and one count of abusive sexual contact in violation of 18 U.S.C. § 2244(b). (ECF No. 1.) Between May 2, 2023, and June 27, 2023, both parties filed motions in limine, and the Court heard argument on July 12, 2023. Arin Heinz and Michael Tierney appeared for the Government. David Torres and Timothy Hennessy appeared for Defendant. The parties agreed to defer argument on the admissibility, under Federal Rules of Evidence 608 and 609, of Defendant's prior convictions and a prior judicial determination of Defendant's credibility until trial. Mr. Torres and Mr. Hennessey also notified the Court that they were still in the process of investigating evidence implicating Federal Rule of Evidence 412, and the Court agreed to defer most of the Rule 412 hearing until August 8, 2023.

1

The Court did, however, hear argument about the admissibility of the prior sexual consent of one uncharged victim, E.B., under Rule 412.  Finally, Mr. Torres and Mr. Hennessey were unable to proceed on their motion to exclude Defendant's statement to law enforcement because they are still waiting to receive a report from an expert on coercive statements.

This order, therefore, addresses three groups of motions in limine only: (1) the Government's motions to admit evidence of other acts pursuant to Rule 404(b); (2) the Government's motions to admit evidence of prior sexual assault allegations against Defendant pursuant to Rule 413; and (3) the Government's motion under Rule 412 to admit evidence of E.B.'s prior consent to have sex with Defendant.

## II.

## Government's Proffer of Factual Allegations

**A.    The August 2016 assaults of K.G.**

K.G. first interacted with Defendant when she accepted a Facebook friend request from him in 2015.  (ECF No. 51 at 6 n. 1.)  She eventually blocked him, and the two had no further contact until an encounter at a gas station outside Yosemite National Park in July 2016.  (*Id.*)  Defendant told K.G. to contact him for hiking recommendations in the area, and K.G. reached out the following month while planning a trip to Yosemite.  (*Id.*)  Defendant suggested a route that K.G. hiked on August 13, 2016.  (*Id.*)

After K.G. completed her hike, she met up with Defendant and accompanied him to a swimming hole with friends.  (*Id.*)  Later that night, Defendant escorted K.G. into the woods to watch a meteor shower with the same group of friends.  (*Id.*)  Rather than meet up with the group, however, Defendant led K.G. to an isolated area where he laid out a blanket and began kissing her aggressively.  (*Id.*)  K.G. told Defendant to stop and pushed him away.  (*Id.*)  A struggle ensued during which K.G.'s nose ring ripped out of her nose.  (*Id.*)  Eventually, Defendant pinned K.G. to the ground, strangled her, and penetrated her vaginally and anally without her consent, telling her, "I can tell you like it rough."  (*Id.*)  After the assault, Defendant led K.G. back to his cabin, where he slept on top of her all night, preventing her from leaving.  (*Id.* at 7.)

///

1       The following day, K.G. went for a hike while Defendant was at work in the park. (*Id.*) She later met up with him and the two hiked to a nearby waterfall. (*Id.*) They sat on a rock near the water and Defendant began to kiss K.G. aggressively as she tried to move away from him. (*Id.*) Defendant then digitally penetrated K.G. without her consent. (*Id.*) Afterwards, they walked back to the park's employee housing area where Defendant assaulted K.G. a third time in the employee showers. (*Id.*) K.G. cried and told Defendant to stop, but he pushed her up against the wall and penetrated her vaginally and anally without her consent. (*Id.*) During the assault, K.G. cried out in pain. (*Id.*) Defendant then led K.G. back to his cabin, where he again slept on top of her through the night. (*Id.*)

      The following morning, K.G. ate breakfast with Defendant and accompanied him on a hike before driving home. (*Id.*) On the drive home, she called a friend and told her about the assaults. (*Id.*) In May 2018, K.G. disclosed the assaults in an anonymous survey, prompting the survey administrator to connect her with another woman, S.F., who claimed that Defendant had assaulted her. (ECF No. 51 at 7–8.) K.G. formally reported the assaults to Yosemite Park Dispatch on April 16, 2020. (*Id.* at 8.)

**B.      Defendant's 2016 suicide attempt and continued contact with K.G.**

      Following the incident, Defendant texted K.G. asking if the two of them could be friends. (ECF No. 50 at 3.) K.G. responded that she "find[s] it hard to be friends with guys who rape me." (*Id.*) After receiving this message, Defendant experienced a meltdown. (*Id.* at 3–4.) Fearing the possibility of arrest and prison, he threatened to kill himself. (*Id.* at 4.) When Defendant took a gun with him into the woods, his roommate called the police, who took Defendant into custody for his safety. (*Id.*) Defendant later told law enforcement that he wanted to kill himself because he did not think he could receive a fair trial. (*Id.*)

      Despite knowing K.G.'s feelings about their time together in August 2016, Defendant reached out to her again in October 2019 while K.G. was visiting Red River Gorge in Kentucky. (*Id.* at 9.) He texted, "Hey. Know we had a weird time and don't want any awkwardness but is that you? Hope you're crushing. Is this you?" (*Id.*) After receiving the message, K.G. learned that Defendant was also in the Red River Gorge area at the time. (*Id.*) In an interview with law

3

enforcement, K.G.'s employer expressed concern that Defendant was stalking K.G. and may have followed her to Red River Gorge. (ECF No. 50-1 at 7–8.)

**C.    Defendant's phone calls from jail to M.W.**

Following Defendant's indictment, the Court detained him pending trial in the Fresno County Jail. On January 11, 2023, Defendant made a recorded call to a friend, M.W. (ECF No. 50 at 5.) Defendant asked M.W. to look for a handwritten note that K.G. had left in Defendant's truck in 2016 that purportedly said, "thank you for the awesome weekend in Yosemite." (*Id.*) When M.W. asked if he should add K.G.'s signature to any note he found, Defendant said no and reminded him that the call was recorded. (*Id.*) Defendant called M.W. again on January 14, 2023 and discussed whether law enforcement would perform a handwriting analysis on any note found in Defendant's truck. (*Id.*) Defendant responded that it did not matter because K.G. "changed her story" and that he was entitled to "have something to throw in the works that is hard to prove." (*Id.*) M.W. did not find a note; nor did law enforcement, which had searched Defendant's truck in August 2022. (*Id.*)

**D.    Prior uncharged allegations of assault against Defendant**

The Government seeks to admit testimony from three different witnesses that Defendant committed five sexual assaults in the six years before, and one year after, the conduct charged in this case.

**i.    Allegations of S.F.**

In 2010 S.F. visited her friend in Bishop, California for a climbing trip. (ECF No. 51 at 8.) After climbing and eating dinner, she returned to her friend's house and met Defendant, who was staying in a spare bedroom. (*Id.*) After speaking briefly with Defendant, S.F. went to sleep on a pull-out couch in the den. (*Id.*) Later that night, S.F. woke up to Defendant lying behind her, touching her breasts and genitals. (*Id.*) S.F. attempted to pull away, and repeatedly told Defendant to get off of her, but he grabbed on to her while pushing his erect penis against her body and telling her, "You know you want it, you know you want it." (*Id.*) At some point, Defendant stopped and left the room. (*Id.*) S.F. later disclosed the assault in an anonymous survey, after which the survey facilitator connected her with K.G. (*Id.* at 9.)

After discovering during a July 2021 interview with law enforcement that S.F. and K.G. had become acquainted, Defendant told law enforcement that he believed they were conspiring to ruin his life. (ECF No. 50 at 8.) Several months later, he entered an emergency room in Mammoth, California and threatened either to kill himself or S.F. (*Id.* at 8–9.) This incident followed two other instances of alleged intimidation of S.F. First, in 2018, Defendant changed his social media profile picture to one of S.F. (*Id.* at 9.) Then, in 2019 he posted online a new climbing route in Yosemite named, "Fuck you [S.F.]." (*Id.*) Defendant later admitted that his threat to kill S.F. violated California Penal Code section 422. (*Id.*)

### ii.    Allegations of J.V.

J.V. and Defendant matched on Twitter in Bend, Oregon in 2015. (ECF No. 51 at 8.) After meeting at a climbing gym, the two of them returned to the group home where J.V. was staying. (*Id.*) At the home, Defendant became too intoxicated to drive, so J.V. allowed him to sleep in her room, telling him, "You can sleep in my room, but no sex." (*Id.*) Once in the bedroom, they began kissing each other consensually, but when Defendant began to take off his clothes, J.V. pushed him away saying, "no." (*Id.*) Defendant then held J.V. down, strangling her "to the point that she feared for her life" and vaginally penetrating her with his penis. (*Id.*) The following day, Defendant went on a walk with J.V. and told her, "I know I raped you." (*Id.*) J.V. felt bad for Defendant and allowed him to stay with her for an unspecified amount of time, during which she had consensual sex with Defendant. (*Id.* at 9–10.)

### iii.    Allegations of E.B.

Defendant met E.B. at a climbing gym in September 2016, after which they began a romantic relationship that involved consensual sex. (ECF No. 51 at 10.) E.B. ended the relationship in December 2016 because of Defendant's emotional instability, but after the breakup Defendant repeatedly called E.B., threatened to commit suicide, showed up at her house unannounced, and tried to get her fired from her job. (*Id.* at 10.) On an unspecified date, Defendant showed up at E.B.'s house with suicidal ideations. (*Id.* at 11.) When they were alone, Defendant pinned E.B. to the ground with his full body weight so that she was unable to move or breathe. (*Id.*) He then vaginally penetrated her with his penis while she told him to get off her. (*Id.*) E.B. states that

5

Defendant later assaulted her two more times in a similar manner, but she is unable to recall when the assaults occurred. (*Id.*) E.B. claims that Defendant had never restrained her previously during consensual sex. (*Id.*)

After the first assault, Defendant returned to E.B.'s house multiple times and threatened to kill himself and her. (ECF No. 50 at 9.) At one point, law enforcement served Defendant with an emergency protective order, and Defendant told E.B. that if she pursued charges against him, he would "ruin her life" and do "unspeakable" things to her. (*Id.*) Defendant eventually pled nolo contendere to misdemeanor trespassing based on this conduct. (*Id.*)

### III.

### Government's Motions Under Federal Rule of Evidence 413

**A.     Legal Standard**

In a criminal trial, Federal Rule of Evidence 413 permits the prosecution to "admit evidence of a sexual assault in order to prove that the defendant has the propensity to commit another sexual assault." *United States v. Redlightning*, 624 F.3d 1090, 1119–20 (9th Cir. 2010). Courts need not make a finding that the government has proven the existence of an uncharged sexual assault to allow evidence of it at trial. *See United States v. Norris*, 428 F.3d 907, 914 (9th Cir. 2005). Rather, after examining all of the evidence, they must assess whether a jury could reasonably find, by a preponderance of the evidence, that the uncharged sexual assault occurred. *Id.* (citing *Huddleston v. United States*, 485 U.S. 681, 690 (1988)).

Rule 413 is not, however, "a blank check entitling the government to introduce whatever evidence it wishes, no matter how minimally relevant and potentially devastating to the defendant." *United States v. LeMay*, 260 F.3d 1018, 1022 (9th Cir. 2001). Because of the inherently prejudicial nature of such evidence, courts must consider whether Rule 403 warrants its exclusion. *See id.* at 1026. Rule 403 prohibits the admission of relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. When weighing Rule 413 evidence under Rule 403, courts consider a non-exhaustive list of factors: (1) the similarity of the other acts to the acts charged; (2) the closeness in time of the other acts to the

acts charged; (3) the frequency of the other acts; (4) the presence or lack of intervening circumstances; and (5) the necessity of the evidence beyond the testimony already offered at trial. *LeMay*, 260 F.3d at 1027–28.

**B.     Analysis of *LeMay* factors**

   **i.     Similarity to charged conduct**

The Government points to four similarities between the charged conduct and the allegations of S.F., J.V., and E.B. Beyond merely stating in a conclusory fashion that the incidents are dissimilar to the charged conduct, Defendant does not seriously argue any material differences between the allegations. As discussed below, the Government persuasively demonstrates that the allegations of S.F., J.V., and E.B. are substantially similar to the conduct at issue in this case.

First, in all cases, Defendant physically restrained his victim to varying degrees. (ECF No. 51 at 15–16.) In this regard, Defendant's assault of J.V. is most similar to the assaults on K.G. because Defendant allegedly pinned both women to the ground and strangled them. E.B. similarly describes Defendant pinning her to the ground, though she does not state that he strangled her. S.F.'s allegation is the most dissimilar. She told the grand jury that she woke up to find Defendant lying down behind her. When she tried to pull away from him, he held her closer so that she could not leave. The fact that this conduct does not exactly mirror K.G.'s allegations, however, is not dispositive. *See United States v. Erramilli*, 788 F.3d 723, 729 (7th Cir. 2015) ("The offenses need not be identical to have substantial probative value."). Moreover, the fact that S.F. does not allege penetration does not make her testimony any less probative. *See United States v. Door*, 663 F. App'x 570, 572 (9th Cir. 2016) (holding that an incomplete sexual assault is not dissimilar to a completed one).

Second, the Government notes that each allegation paints Defendant as rapidly escalating a non-sexual interaction into penetration or attempted penetration. (ECF No. 51 at 16–17.) In the cases of S.F. and E.B., Defendant appeared out of nowhere and restrained them with no warning. J.V.'s account is slightly different because she kissed Defendant consensually prior to the assault. Like K.G.'s account, however, J.V. told Defendant repeatedly that she did not want to have sex with him, rendering his decision to pin her down a significant and unexpected escalation.

7

Third, Defendant isolated each of his victims before assaulting them. (ECF No. 17.) In the case of E.B., Defendant pretended to be asleep and waited until a visitor had left before immediately jumping on her. Similarly, the assault on J.V. occurred in her bedroom. Defendant attempts to distinguish S.F.'s account by noting that the alleged assault occurred in the living room of a friend's home while two people slept in an adjoining room. (ECF No. 12.) He does not, however, explain why this distinction should make a difference in the Court's assessment.

Finally, the Government points out that Defendant's victims all shared similar characteristics. (ECF No. 51 at 17–18.) All of them had "petite, thin frames." (*Id.* at 16.) They were also all members of the same climbing community of which Defendant was a part. (*Id.* at 18.) Finally, like K.G., both S.F. and J.V. had limited interactions with Defendant before the alleged assaults. Defendant points out that E.B. had known him for months before the assault. (ECF No. 60 at 12.) This is true, but the other characteristics of Defendant's assaults on E.B. are similar enough in nature that this one difference is not controlling. *See United States v. Yarlott*, No. CR 20-60-BLG-DLC, 2020 WL 6393894, at *5 (D. Mon. Nov. 2, 2020) (describing fact that defendant had prior acquaintance with first victim but no relationship with second victim as one of few "slight differences [that] pale in comparison to the striking similarities between the two events").

In sum, the proposed testimony of S.F., J.V., and E.B. describes instances of sexual assault that are strikingly similar. While there are some differences between the accounts, those differences do not rise to a level that would warrant exclusion of the testimony. The only allegations that give the Court pause are E.B.'s accusations that Defendant assaulted her on two other unspecified occasions. While E.B. states that all three assaults were similar, she did not provide any details about the second and third assaults. Without more details, it is difficult to assess whether or not they actually shared similarities with the charged assaults.

    **ii.    Proximity**

All of the alleged assaults occurred within a seven-year period – from March 2010 to December 2016. Courts have admitted evidence under Rule 413 with longer gaps in time. *See LeMay*, 260 F.3d at 1029 (admitting evidence of assault that occurred eleven years before the conduct at issue in trial). This factor weighs in favor of admissibility.

### iii. Frequency

Between S.F., J.V., and E.B., the government seeks to introduce evidence of five prior sexual assaults. This is a frequency that certainly cuts in favor of admissibility. In *LeMay*, the Court of Appeals held that two prior instances of assault were sufficient to demonstrate frequency, even when one of those instances occurred eighteen years before the conduct at issue. *Id.* Here, not only has the Government posited more instances of assault than in *LeMay*, but it has also alleged instances closer in time both to each other and to the charged conduct.

### iv. Intervening circumstances

Neither party argues that there are any relevant intervening circumstances.

### v. Necessity

Evidence of uncharged sexual assaults "need not be *absolutely* necessary to the prosecution's case in order to be introduced; it must simply be helpful or *practically necessary*." *LeMay*, 260 F.3d at 1029. The government argues that evidence of the assaults on S.F., J.V., and E.B. "is necessary to corroborate K.G.'s account and counter any defense claims of reasonable mistake of fact as to consent." (ECF No. 51 at 19.) Such evidence is particularly important in a case like this where the only two witnesses to the alleged assault are Defendant and K.G. (*Id.*) The Ninth Circuit has held that the need for corroboration is sufficient to weigh this factor towards admissibility. *See, e.g.*, *LeMay*, 260 F.2d at 1028. Defendant does not refute this contention with any substantive arguments.

Even if each individual account of assault might corroborate the charged conduct, the cumulative effect of introducing multiple accounts may cut against the necessity factor. Courts have recognized that the necessity of Rule 413 testimony diminishes with each additional witness unless that witness can corroborate different aspects of the prosecution's case. *See United States v. Perrault*, 995 F.3d 748, 769 (10th Cir. 2021) (discussing Fed. R. Evid. 414); *United States v. Never Misses A Shot*, 781 F.3d 1017, 1028 (8th Cir. 2015). Rule 413 does not set a limit on the number of witnesses allowed to testify, but courts have expressed concern when that number exceeds four. *See, e.g.*, *United States v. Shaw*, No. 22-cr-00105-BLF-1, 2023 WL 2815360, at *9–*10 (N.D. Cal. Apr. 5, 2023). The Government's proposed testimony concerning five prior assaults

falls right on this line. Given the concerns the Court has already expressed about the lack of specificity regarding E.B.'s second two assault allegations, it seems appropriate to exclude testimony about them due to their potentially cumulative effect.

### vi. Other factors

Defendant notes that none of the allegations of S.F., J.V., or E.B. have resulted in convictions. In fact, no jurisdiction has ever even charged him with crimes associated with the allegations. This fact is not dispositive. *LeMay*, 260 F.3d at 1029 ("[T]he extent to which an act has been proved is a factor that district courts may consider in conducting the Rule 403 inquiry.") Nevertheless, it does cut against admissibility. *See United States v. Porter*, 562 F. Supp. 3d 1162, 1171 (E.D. Cal. 2022).

**C.     Conclusion**

Almost all of the *LeMay* factors weigh in favor of admissibility, and Defendant has not shown that the testimony of S.F., J.V., and E.B. would be substantially more prejudicial than probative. Additionally, none of the uncharged incidents of sexual assault are more "sensational or disturbing" than the charged incident. *Porter*, 562 F. Supp. 3d at 1171 (citing *United States v. Gabe*, 237 F.3d 954, 960 (8th Cir. 2001)). The Court's only reservations concern E.B.'s second and third assault allegations. Her memory of them is limited, and permitting her to testify to them would likely be unnecessary given the high probative value of the other three allegations

Therefore, the Government's motion to admit evidence of Defendant's prior assaults on S.F. and J.V. is **GRANTED**. The motion is also **GRANTED** as to Defendant's first assault on E.B. It is **DENIED** as to his second and third assaults on E.B.

### IV.

### Government's Motions Under Federal Rule of Evidence 404(b)

**A.     Legal Standard**

Uncharged conduct is typically not admissible to prove a defendant's propensity to commit the charged crime, but courts may admit it to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Evidence of uncharged conduct may also be admissible under Rule 404(b) to show a defendant's consciousness

of guilt. *See United States v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995). The government meets its burden to admit such evidence if it shows that: "(1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged." *United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012) (citation omitted). To satisfy the first prong of this test, "the government must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." *United States v. Ramos-Atondo*, 732 F.3d 1113, 1123 (9th Cir. 2013) (internal quotation marks and citation omitted). Even if evidence is admissible under Rule 404(b), the court may exclude it if the danger of unfair prejudice substantially outweighs its probative value. *Id.*; *see also* Fed. R. Evid. 403.

**B.     Defendant's 2016 suicide attempt**

The Government argues that evidence of Defendant's suicide attempt is admissible because it demonstrates his consciousness of guilt. (ECF No. 50 at 4.) Defendant contends that evidence of his suicide attempt is unduly prejudicial and risks confusing the jury because it was a product of his fear of punishment at the hands of an unjust judicial system, not an acknowledgement of his guilt. (*See* ECF No. 60 at 5.)

No Ninth Circuit cases have addressed the admission of suicide attempts as evidence of consciousness of guilt. *Cf. United States v. Cody*, 498 F.3d 582, 591–92 (6th Cir. 2007); *Tug Raven v. Trexler*, 419 F.2d 536, 543 (4th Cir. 1969). Nevertheless, the Court finds compelling the Government's comparison of suicide to a defendant's flight from law enforcement. (*See* ECF No. 50 at 4.) "Since 'flight' is essentially an admission by conduct, its probative value as circumstantial evidence depends upon the degree of confidence with which four inferences can be drawn: '(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.'" *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1207 (9th Cir. 1991) (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)).

///

Here, there is a direct line between Defendant's suicide attempt and the conduct at issue in this case. It is also reasonable to infer that Defendant attempted suicide because of his fear of a prison sentence for a charge of which he knew he was guilty. The fact that there is an alternative explanation for Defendant's conduct – that he was afraid of suffering prison time because of an unfair trial – does not render this evidence substantially more prejudicial than probative. Rather, it provides Defendant an opportunity to give the jury an alternative explanation for his behavior.

Therefore, the Government's motion to admit evidence of Defendant's 2016 suicide attempt is **GRANTED**.

**C.     Defendant's phone calls with M.W.**

The Government argues that Defendant's phone calls with M.W. were an attempt to manufacture evidence. (ECF No. 50 at 5–6.) Defendant, on the other hand, argued at the hearing that the call represents nothing more than an expression of frustration on his part, and he emphasizes that he explicitly told M.W. not to affix K.G.'s signature to any note found in Defendant's truck. Even if the conversation was evidence of an attempt to manufacture evidence, he argues, it is too dissimilar from the charged conduct to be admissible under Rule 404(b), and its admission would be unduly prejudicial.

Because attempts to manufacture evidence demonstrate a consciousness of guilt, they are typically admissible under Rule 404(b). *See United States v. Clark*, 24 F.4th 565, 581 (6th Cir. 2022); *see also United States v. Fox*, 627 F. App'x 608, 609 (9th Cir. 2015). The fact that there are multiple ways to interpret Defendant's phone calls with M.W. does not render them inadmissible – as with evidence of his suicide attempt, Defendant can present his own interpretation to the jury. Additionally, the fact that it is possible to argue for an innocent interpretation of Defendant's phone call with M.W. indicates to the Court that it is not likely to inflame the jury or cause it to come to a decision on an improper basis. Finally, the fact that the act of calling and speaking with M.W. was dissimilar to the charged conduct is not controlling because "similarity is not always a prerequisite under Rule 404(b)." *United States v. Miller*, 874 F.2d 1255, 1269 (9th Cir. 1989). Courts typically require a showing of similarity when the government offers evidence of prior acts to prove a defendant's identity, *modus operandi*, or the absence of a mistake. *See id.* The

Government's purpose here is to prove Defendant's consciousness of guilt, and a showing of similarity is, therefore, not necessary.

Therefore, the Government's motion to admit evidence of Defendant's phone calls with M.W. is **GRANTED**.

**D.     Defendant's intimidation of K.G., S.F., and E.B.**

The Government seeks admission of witness testimony, text messages, police records, and court records regarding Defendant's stalking of K.G., his online posts about S.F., and his threats to both S.F. and E.B. as evidence of both a common plan to intimidate his victims as well as evidence of his consciousness of guilt. (ECF No. 50 at 9–10.) Defendant does not challenge admissibility of the proposed intimidation evidence but does challenge the admission of any convictions associated with this conduct. (*See* ECF No. 60.) Defendant confirmed this position at the hearing, arguing only that the evidence of witness intimidation is highly prejudicial.

Evidence that a defendant has intimidated or threatened witnesses is admissible under Rule 404(b) to show consciousness of guilt. *See United States v. Ho*, 651 F. Supp. 2d 1191, 1201 (D. Haw. 2009) (collecting cases). Defendant has not demonstrated that admission of this evidence would be substantially more prejudicial than probative. Evidence of Defendant's conduct following the assaults of K.G., S.F., and E.B. tends to corroborate incidents where no other witnesses were present. Because the Court has reserved ruling on the admissibility of Defendant's prior convictions until trial, however, it will not address his admission to violating California Penal Code section 422 for his threats against S.F. or his misdemeanor trespass conviction following his interactions with E.B.

Therefore, the Government's motion to admit evidence of threats and intimidation against K.G., S.F., and E.B. is **GRANTED**, except as to evidence of Defendant's admission to violating California Penal Code section 422 and his misdemeanor trespass conviction. As to those convictions, the Court reserves judgment.

///

///

///

V.

**Government's Motion to Admit Evidence of E.B.'s Prior Consent Under Federal Rule of Evidence 412**

The Government seeks to admit testimony from E.B. of prior instances of consensual sexual contact with Defendant that did not involve restraints or strangulation. (ECF No. 52 at 4.) It argues that this evidence is relevant to rebut any argument Defendant may make regarding reasonable mistake of fact or consent. (*Id.* at 9.) "As amended in 1994, Rule 412 forbids the admission of evidence of an alleged victim's 'sexual behavior' or 'sexual predisposition' in all 'civil or criminal proceeding[s] involving alleged sexual misconduct' except under limited circumstances." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1104 (9th Cir. 2002) (quoting Fed. R. Evid. 412(a)). One exception to this rule permits "evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct . . . if offered by the prosecutor." Fed. R. Evid. 412(b)(1)(B). Defendant did not acknowledge this argument in his opposition to the Government's motion. At the hearing, he simply stated a general objection to admission of testimony from S.F., J.V., and E.B. on the grounds that it would be cumulative. As discussed above, the Court disagrees with this assessment. Because the Government's request aligns with an explicit Rule 412 exception, the Court will grant its motion.

Therefore, the Government's motion to admit testimony of E.B.'s prior consent is **GRANTED**.

IT IS SO ORDERED.

Dated:   July 13, 2023

UNITED STATES DISTRICT JUDGE

14